**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

PUERTO RICO SOCCER LEAGUE NFP,
CORP., ET AL

      **Plaintiffs**

          v.

FEDERACIÓN PUERTORRIQUEÑA DE
FUTBOL, ET AL

      **Defendants**

      **CIVIL NO. 23-1203 (RAM)**

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is co-defendant Fédération Internationale de Football Association's ("FIFA") *Motion to Dismiss the Third Amended Complaint* ("*Motion*" or "*Motion to Dismiss*"), as well as the corresponding opposition, reply, and surreply. (Docket Nos. 88, 105, 113, and 117). For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** FIFA's *Motion*.

### I.   BACKGROUND

    FIFA seeks dismissal of the totality of Plaintiffs' claims against it, namely: violations of section 1 of the Sherman Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as tortious interference with a contract, abuse of process, and breach of fiduciary duty under Puerto Rico law.

    On September 30, 2024, the Court issued an Opinion and Order describing the procedural background of this case and granting in

part a motion to dismiss by co-defendants Federación Puertorriqueña de Fútbol, Inc. ("FPF") and its directors. (Docket No. 129). Specifically, the Court dismissed Plaintiffs' RICO and Puerto Rico law claims as to FPF and its directors. The Court incorporates by reference that Opinion and Order in its entirety for the purposes of the present *Motion*.

## II.   MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The Court begins by considering FIFA's request that the Court dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

### A. Legal Standard

A federal court's exercise of personal jurisdiction over a defendant must satisfy both the long-arm statute of the forum in which the tribunal sits and the Due Process Clause of the Constitution. Baskin-Robbins Fran. LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). The First Circuit has held, and FIFA agrees, that Puerto Rico's long-arm statute extends "up to the point allowed by the Constitution." Negron-Torres v. Verizon Commc'ns., Inc., 478 F.3d 19, 24 (1st Cir. 2007) (citation omitted); (Docket No. 88 at 13). Therefore, the Court discusses only the constitutional requirements.

Due Process requires a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'" Baskin-Robbins Fran. LLC, 825 F.3d at 34-35 (quoting Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945)). Such contacts can establish either general jurisdiction or specific jurisdiction over a defendant.

Under a theory of general jurisdiction, the minimum-contacts requirement is satisfied by showing a defendant's "continuous and systematic activity" in the forum state or territory, regardless of those contacts' relation to the litigation at hand. Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995). "[T]he lodestar of the inquiry is whether the corporation's general business contacts with the forum are sufficiently continuous and systematic 'as to render [it] essentially at home in the forum State.'" Kuan Chen v. United States Sports Acad., Inc., 956 F.3d 45, 57 (1st Cir. 2020) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). "The paradigmatic examples of locales in which a defendant corporation is considered at home are its state of incorporation and the state that houses its principal place of business." Id. (citing BNSF Ry. Co. v. Tyrrell, 581 U.S. 402, 413 (2017)). However, there are rare cases where "a defendant corporation's general business operations in a state in which it is neither

Civil No. 23-1203 (RAM)                                                4

incorporated nor headquartered 'may be so substantial and of such a nature as to render the corporation at home in that State.'" Id. (quoting Daimler AG v. Bauman, 571 U.S. 117, 761 n.19 (2014)).

On the other hand, specific jurisdiction requires the minimum contacts be related to the plaintiff's claims. PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 17 (1st Cir. 2019). Specifically, a plaintiff must show:

> (1) its claim directly arises out of or relates to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable.

Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 7 (1st Cir. 2018) (citation omitted).

The conventional method for determining if the requirements for jurisdiction are met is the prima facie approach, where a court considers "only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Foster-Miller, Inc., 46 F.3d at 145 (citation omitted). "To make a prima facie showing of this calibre [sic], the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." Id.; see also Plixer Int'l, Inc., 905 F.3d at 7; PREP Tours, Inc., 913 F.3d

at 16. The court accepts as true any properly documented proffers of evidence, as well as any undisputed facts asserted by the defendant. PREP Tours, Inc., 913 F.3d at 16-17 (citation omitted); Plixer Int'l, Inc., 905 F.3d at 6 (citation omitted).

**B. Forum-Related Contacts**

Here, the Court applies the prima facie approach because there are enough facts proffered by Plaintiffs or undisputed by FIFA to determine whether the Court has personal jurisdiction over FIFA, and fairness does not require holding a hearing to make that determination. *See* Foster-Miller, Inc., 46 F.3d 138 at 145-46. The Court considers only those contacts by FIFA that occurred leading up to and around the time of Defendants' allegedly illegal conduct, beginning in March of 2018. *See* (Docket No. 33 at 14); Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (concluding "proper focus" of specific-jurisdiction analysis is "contacts leading up to and surrounding the claimed injury"). While the Court has considered all of the documents attached to Plaintiffs' *Opposition* and non-controverted contacts, it summarizes here only those that are relevant to the Court's discussion.

In 2002, FIFA, CONCACAF, and FPF signed an agreement creating a normalizing commission to restructure FPF. (Docket No. 105-1 at 20). One of the commission's tasks was to elect a new executive committee. Id. Pursuant to this agreement, FIFA wrote in January

of 2003 to inform FPF that it viewed FPF's recent election of an executive committee, without the input of the normalizing commission, to be illegitimate. Id. at 23.

On January 31, 2003, FIFA wrote FPF to request the results of a recent audit that had been conducted of FPF. Id. at 25.

On November 12, 2013, the Secretary General of FIFA, Jérôme Valcke ("Valcke"), wrote to the president of FPF, Eric Labrador, and referenced a recent two-day meeting in San Juan attended by representatives of FIFA, CONCACAF, and FPF. (Docket No. 105-2 at 8). Valcke stated that at those meetings, FIFA "learned that several leagues and other groups active in Puerto Rico are independent and operate outside the FPF." Id. Therefore, Valcke reminded FPF that the FIFA Statutes require FPF to "**organize, supervise and control football, whatever its form, at the national level,** and to recognize all leagues and groups, as well as to guarantee their affiliation to the federation." Id. (emphasis added). Valcke urged FPF "to take measure to ensure the fulfillment of its obligations" and requested FPF "keep us updated on any developments in this regard." Id. He asserted FPF "must fully comply with the FIFA Statutes" and "any infringement may result in penalties." Id.

In the same letter, Valcke reminded FPF the FIFA Statutes require Member Associations to "adopt Statutes that respect the provisions of the FIFA Model Statutes." Id. at 9. Valcke continued:

> In this context, [t]he FIFA Associations Committee has decided that its association will have to conclude the process of revising the statutes before the next elections for the FPF leadership positions are held. To this end . . . we proposed a new version of the FPF Statutes and we hope to receive your comments on it as soon as possible.

Id.

On September 27, 2019, Mattias Grafström ("Grafström"), who Plaintiffs allege works for FIFA, responded to an email from FPF regarding purported plans by several FIFA-affiliated teams in Puerto Rico to participate in an unsanctioned event. (Docket No. 33 at 17-18). According to Plaintiffs, Grafström "inform[ed] FPF that it can take action against members that participate in a tournament that was not authorized by the Federation and that the Federation was in a position to act in conformance with Article 14(1)(d) of the FPF Statutes." Id. at 18. As discussed below, FIFA does not dispute that this email exchange took place. See (Docket Nos. 88 at 15-16 and 113 at 7-8).

As of fall of 2019, when PRSL was purportedly excluded from the market for league tournaments, FIFA allegedly recognized FPF as the "FIFA-affiliated sanctioning authority in Puerto Rico." (Docket No. 33 at 10). Also during that time, multiple soccer-

related entities in Puerto Rico were affiliated with FIFA. Id.
Plaintiffs allege each of these organizations, including FPF and
CONCACAF, as well as various leagues and clubs, were required to
comply with FIFA's "rule that all league tournaments must be
sanctioned by the National Association in whose territory the match
will be played, Puerto Rico in this case." Id. According to
Plaintiffs, and not disputed by FIFA, "[a]ny violation of FIFA
rules [by these organizations] [was] subject to discipline." Id.

On August 16, 2021, the FIFA Director of Member Associations,
Kenny Jean-Marie ("Jean-Marie"), wrote to FPF's then-president
Iván Rivera Gutiérrez. (Docket No. 105-2 at 12). Jean-Marie stated
that upon analyzing the 2019 edition of the FPF statutes, "we
consider that the next elections should be held in March 2023."
Id.

On June 29, 2022, and October 2, 2023, FIFA posted information
on its website, as well as issuing a press release, regarding its
investments in Puerto Rico via the Forward Development program.
(Docket No. 105-1 at 4). The website and press release explained
FIFA had provided "technical and financial backing" for FPF to
purchase land, obtain sports facilities, and develop youth soccer
leagues. Id.

On November 11, 2022, Jean-Marie wrote to FPF again, stating
in part:

> We acknowledge receipt of your email dated October 7, 2022, which contains the ratified version of the Statutes of the Puerto Rican Football Federation (FPF) that was approved by the FPF Congress held on October 5, 2022.
> In this regard, we inform you that we have reviewed this version and confirm that it complies with the requirements and standards of FIFA and Concacaf.

(Docket No. 105-2 at 16). Jean-Marie added that "these new statutes should be used for the organization of the next [FPF] elections at the beginning of 2023." Id. Jean-Marie made two additional points in the letter. First, "FPF must, at all times, manage its affairs independently and ensure that there is no interference by third parties in its internal affairs and respecting at all times the statutes and guidelines of its international football governing bodies." Id. Second, FPF was to keep FIFA "informed at all times" of any changes to FPF statutes. Id.

Around the time of the November 2022 letter, a FIFA representative also met in person with FPF representatives. According to the Declaration of María E. Larracuente ("Larracuente"), (Docket No. 105-3), a senior manager at FIFA "tasked with political and diplomatic issues linked to Member Associations" met with FPF representatives, officers and General Assembly members to discuss FPF's revised statutes. Id. at 6. These meetings allegedly took place in October and November of 2022. Id. at 6-7.

Finally, as of April 13, 2024, FPF sold a FIFA-branded office chair in Puerto Rico. (Docket No. 105-3 at 6).

**C. General Jurisdiction**

The Court begins by assessing Plaintiffs' claim that FIFA is subject to general jurisdiction in Puerto Rico. At the outset, FIFA's contacts with Puerto Rico fall outside the paradigm examples of an organization "at home." BNSF Ry. Co., 581 U.S. at 413. Plaintiffs do not dispute that FIFA has no office, mailing address, or phone number in Puerto Rico. (Docket No. 105-1 at 2). It is also undisputed that FIFA is not registered to do business in Puerto Rico. Id. Nor does FIFA have any real property interest, pay income taxes, hold accounts, keep books, or maintain records in Puerto Rico. Id. Notwithstanding this, Plaintiffs assert FIFA is subject to general jurisdiction in Puerto Rico based on a potpourri of FIFA contacts with Puerto Rico since 2002. After reviewing these, contacts, the Court finds FIFA is **not** subject to general jurisdiction in Puerto Rico.

To begin, while Plaintiffs proffer FIFA's role in restructuring FPF from 2002 to 2004, the next example of forum-related contacts after that did not occur until 2013. *See* (Docket Nos. 105-1 at 1-3 and 105-2 at 6). Given that roughly nine-year gap, the activities of FIFA's normalizing commission from 2002 to 2004 can hardly be considered evidence of FIFA's continuous and

systematic activity in Puerto Rico today. *See* <u>Worldwide Subsidy</u>
<u>Grp., LLC v. Fed'n Int'l de Football Ass'n</u>, 2014 WL 12631652, at
*7 (C.D. Cal. 2014) ("These facts, all of which concern activity
in which FIFA was engaged more than ten years ago, do not
demonstrate that such activity is ongoing now or that is has been
ongoing in the interim period.").

Next, to the extent Plaintiffs argue FIFA is subject to
general jurisdiction by attributing FPF's activities to FIFA, that
argument fails. In <u>Daimler</u>, the Supreme Court held that even if a
subsidiary's actions in a forum were attributed to its parent
corporation, that would be insufficient to subject the parent
corporation to general jurisdiction. 571 U.S. at 136. Plaintiffs
make no attempt to distinguish this case, and they would have
trouble doing so; if a corporate subsidiary's actions do not
automatically subject its parent to general jurisdiction, neither
do the actions of FPF, which is not a subsidiary of FIFA.

That leaves Plaintiffs' argument for general jurisdiction
resting on an assortment of FIFA activities since 2013: FIFA's
meetings and communications with FPF regarding implementation of
FIFA policy; review of FPF' statutes and oversight of FPF's
internal elections; ongoing designation of FPF as FIFA's
affiliating authority in Puerto Rico; recognition of other FIFA
affiliates in Puerto Rico; investment in Puerto Rico through the

Civil No. 23-1203 (RAM)                                                12

Forward Development Program, and licensing or distributing FIFA-branded products to be sold by FPF in Puerto Rico. However, Plaintiffs' allegations make clear these contacts constitute only a small fraction of FIFA's activities as an organization. *See* (Docket No. 33 at 7 (alleging FIFA has 211 affiliated national federations around the world). Though a corporation may have many homes, it cannot lay its head everywhere. *See* Daimler, 571 U.S. at 139 n.20. Rather, in determining where a corporation is subject to general jurisdiction, courts should conduct "an appraisal of a corporation's activities in their entirety." BNSF, 581 U.S. at 413. Having done so, the Court concludes this is not the "exceptional case in which [FIFA's] general business operations in [Puerto Rico] are so unusually substantial that [FIFA] can fairly be described as at home" here. Kuan Chen, 956 F.3d at 57.

### D. **Specific Jurisdiction**

Because FIFA is not subject to general jurisdiction in Puerto Rico, the Court considers whether Plaintiffs have put forward sufficient facts to showing FIFA is subject to specific jurisdiction. After considering the contacts with Puerto Rico documented by Plaintiffs or undisputed by FIFA, the Court finds they support a finding of specific personal jurisdiction as to Plaintiffs' section 1 claim but not their RICO Act claims.

**1. Sherman Act Claim**

      i. *Relatedness*

The Court finds Plaintiffs have proffered multiple contacts between FIFA and Puerto Rico that directly relate to its allegations of anticompetitive conduct. These include: FIFA's 2013 in-person meetings with FPF officials less than six years prior to the cancellation of PRSL's 2019-2020 tournament; FIFA's 2013 follow-up letter; Grafström's 2019 email to FPF; FIFA's ongoing authorization of FPF as the local sanctioning authority for FIFA in Puerto Rico; and the continuing recognition of FIFA affiliates in Puerto Rico on the condition that they follow FIFA's tournament-participation policy. By seeking compliance with FIFA statutes in Puerto Rico, FIFA sought to enforce the very policies that Plaintiffs challenge as anticompetitive: the proscription on sanctioning a league tournament not operated by FPF and the prohibition on clubs or teams participating in non-sanctioned events. (Docket No. 33 at 9-10, 44). Furthermore, its directive to FPF to "organize, control, and affiliate" all local soccer organizations in Puerto Rico relates to Plaintiffs' allegation that FPF and FIFA schemed for FPF to exercise its sanctioning authority in an anticompetitive manner. (Docket Nos. 33 at 44 and 105-2 at 8).

FIFA points out that Plaintiffs' allegations are that FPF committed fraud when it warned clubs and teams from participating in PRSL's tournament, since PRSL was still affiliated with FIFA and therefore not subject to the ban on participating in non-sanctioned events. (Docket No. 88 at 16-17). FIFA is correct to the extent that it identifies an ambiguity in Plaintiffs' *Complaint*. On the one hand, Plaintiffs allege FPF committed fraud by telling clubs and players in Puerto Rico that PRSL was not affiliated when it actually was. (Docket No. 33 at 18). On the other hand, Plaintiffs allege they found out before the 2019-2020 season began that PRSL "would no longer be . . . sanctioned by FIFA." (Docket No. 33 at 19). They aver further that PRSL's affiliation was "unlawfully withheld" and that PRSL "has not been able to obtain [FPF's] affiliate status since." Id. at 20.

For purposes of a 12(b)(2) motion, the Court must "constru[e] disputed facts in the light most hospitable to [the] plaintiff." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). Read from this perspective, Plaintiffs' *Complaint* fairly alleges FPF began announcing to clubs and players that PRSL was no longer affiliated before it had formally revoked the affiliation, but that FPF did in fact revoke the affiliation at a later date. If so, FIFA's tournament-participation policy would still have directly harmed Plaintiffs. Whether FPF lied about PRSL's

affiliation first, then revoked it, or revoked it first and continued to withhold it, the difference would not change the fact that FIFA's tournament-participation, as enforced in Puerto Rico against PRSL, was the mechanism that allegedly excluded PRSL from the market. As such, the Court is satisfied Plaintiffs have shown a "nexus between [their] claim and the defendant['s] forum-based activities." Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc., 43 F.4th 150, 160-61 (1st Cir. 2022).

ii. *Purposeful availment*

Since FIFA's forum-related contacts are related to Plaintiffs' section 1 claim, the Court proceeds to consider whether they also constitute purposeful availment of the privilege of doing business in Puerto Rico. PREP Tours, Inc., 913 F.3d at 19. Because FIFA's business includes governing soccer, (Docket No. 88 at 9), the Court asks in part whether FIFA purposefully availed itself of the privilege of governing soccer here in Puerto Rico. *See* Hollins v. U.S. Tennis Ass'n, 469 F. Supp. 2d 67, 73-74 (E.D.N.Y. 2006) (finding that The International Tennis Federation's "business is sanctioning and regulating tennis tournaments" and collecting similar cases); *cf.* Anderson v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 501 (S.D.N.Y. 2000) (asking whether for purposes of New York's long-arm statute defendant had "purposefully avail[ed]

itself of the privilege of conducting **activities**" in the forum) (emphasis added).

The Court finds that it has. FIFA "deliberately reached beyond its home" into Puerto Rico in at least two ways. Rodriguez-Rivera, 43 F.4th at 163 (citation omitted). **First**, it chose to authorize a local sanctioning authority in Puerto Rico, namely, FPF. This authority is allowed to sanction soccer organizations and tournaments in Puerto Rico on the condition they comply with FIFA rules. **Second**, FIFA has repeatedly contacted FPF in order to induce it to enforce FIFA policies. This included sending FIFA personnel to meet FPF personnel in San Juan, issuing a follow-up letter that contained both directives and threats of penalties for non-compliance, and encouraging FPF to enforce FIFA policy in Puerto Rico. *See* Shields v. Fed'n Internationale de Natation, 419 F. Supp. 3d 1188 (N.D. Cal. 2019) (citing meetings between representatives of world swimming organization and national federation, along with email correspondence between the two organizations and world organization's request for follow-up as among the contacts that supported personal jurisdiction over FINA).

Considered together, these activities "assure that personal jurisdiction is not premised solely upon [FIFA's] 'random, isolated, or fortuitous' contacts." Rodriguez-Rivera, 43 F.4th at 163 (citation omitted). Rather, FIFA's conduct evinces both

voluntariness and foreseeability. *See* Ticketmaster, 26 F.3d at
207. There is no doubt FIFA activities in Puerto Rico have been
and continue to be voluntary. While FIFA is correct Grafström's
email came in response to an email from FPF, there is no suggestion
Grafström was somehow tricked into misstating FIFA policy or how
it could be applied in Puerto Rico. *See* (Docket Nos. 33 at 18; 88
at 9-10 and 113 at 7). Nor is there reason to think Grafström would
have replied differently had FPF waited to contact him until after
PRSL's affiliation was officially revoked. Grafström's willingness
to field FPF's email and his decision to respond by telling FPF it
could take action against noncompliant members both show,
alongside the other facts proffered by Plaintiffs, that FIFA
availed itself of the privilege of conducting its business (i.e.,
soccer governance) in Puerto Rico. True, Grafström's email alone
may not have allowed FIFA to foresee being haled into Puerto Rico.
Viewed together, however, FIFA's ongoing efforts to enforce its
policy with regard to specific entities in Puerto Rico should have
allowed it to reasonably foresee that legal challenges to those
policies could potentially cause it to incur liability. As such,
the Court is satisfied Plaintiffs have met their burden of showing
purposeful availment by FIFA.

iii. *Reasonableness*

Finally, while the Court finds FIFA established the requisite minimum contacts in Puerto Rico to subject it to personal jurisdiction, the Court may decline to exercise that jurisdiction if doing so would be unreasonable. *See* Harlow, 432 F.3d at 66. To determine that question, courts consider the following gestalt factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996). For FIFA to avoid personal jurisdiction on the basis of these factors, it must make a "compelling case" that some or all of these factors "would render jurisdiction unreasonable." *See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77 (1985).

In this case, FIFA's only argument about reasonability is that the Grafström email was induced by fraud. (Docket No. 88 at 9 n.4). However, as the Court has already explained, none of the facts alleged by Plaintiff suggest the substance of the policy articulated by Grafström, nor his decision about how to respond to a report of participation in non-sanctioned tournaments, was

induced by fraud. More importantly, as indicated above, the Court's finding that FIFA's forum-related contacts are related to Plaintiffs' section 1 claim and constitute purposive availment is based not just on Grafström's email alone but on FIFA's multiple efforts to govern soccer in Puerto Rico ahead of PRSL's alleged exclusion. Thus, with FIFA's sole argument regarding reasonableness already addressed, the reasonableness analysis favors the exercise of personal jurisdiction. *See* Knox v. MetalForming, Inc., 914 F.3d 685, 693 (1st Cir. 2019) (finding personal jurisdiction after disposing of defendant's single argument concerning reasonableness).

Consideration of the gestalt factors confirms this conclusion. **First**, while it is "almost always inconvenient and costly for a party to litigate in a foreign jurisdiction," "[FIFA] alleges nothing special or unusual about its situation; indeed, it does not even argue it would be burdened by litigating in Puerto Rico." Rodriguez-Rivera, 43 F.4th at 166.

**Second**, Plaintiffs' allegations of anticompetitive injury raise the specter of ongoing harm to consumers in the market for league tournaments in Puerto Rico, potentially dampening the output of tournaments played by top talent. Moreover, "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-

of-state actors." Burger King Corp., 471 U.S. at 473 (citation omitted).

**Third**, Plaintiffs' choice of forum should be afforded a "degree of deference," Foster-Miller, Inc., 46 F.3d 138 at 150, and FIFA has not argued another forum would be more convenient for Plaintiffs.

**Fourth**, the interest of the interstate judicial system in obtaining efficient resolution of controversies points towards exercising jurisdiction here in Puerto Rico, since the antitrust allegations could lead to the need for local experts to analyze the relevant Puerto Rico market.

**Fifth**, Puerto Rico has an interest in "affording its citizens a convenient forum in which to bring their claims." Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 719 (1st Cir. 1996). At the same time, Switzerland has its own interests in protecting its businesses and providing them a convenient forum. *See* id. This last factor, then, does not cut in either direction. All the other factors, however, weigh towards exercising personal jurisdiction. Accordingly, the Court finds that the exercise of personal jurisdiction over FIFA in this case is both authorized by Puerto Rican law and in keeping with due process. FIFA's *Motion to Dismiss* as it relates to personal jurisdiction with regards to Plaintiff's Sherman Act claim is therefore **DENIED**.

**2. RICO Act & Puerto Rico Law Claims**

While the Court finds it has personal jurisdiction over FIFA as to the section 1 claim, the Court finds Plaintiffs' showing of personal jurisdiction is insufficient as to their RICO Act and commonwealth-law claims. That is because Plaintiffs have failed to show the purported RICO or commonwealth-law violations arose from or are related to FIFA's forum-related contacts. *See* <u>Plixer Int'l, Inc.</u>, 905 F.3d at 7.

  i. *RICO Act claims*

Plaintiffs' allegations regarding purported RICO conduct are that some or all of FPF Defendants (1) misrepresented PRSL's and the Pumas' affiliation status; (2) misstated FPF rules during the Pumas' affiliation process; (3) filed fraudulent complaints against Cornejo within FPF and lied about the appeals process; (4) used deceit to prevent Larracuente from bringing her own complaints; (5) blocked Larracuente from running for FPF president; (6) misrepresented Larracuente's availability to work for CONCACAF; (7) misrepresented a candidate's credentials during an FPF election; (8) registered a travel agency as a front to hide a conflict of interest; and (9) hired foreign nationals to work illegally. Id. at 9-46.

Plaintiffs accuse only FPF Defendants of specific conduct violating RICO. Plaintiffs' RICO-related allegations against FIFA

are based on group pleadings or bald assertions. See, e.g., (Docket No. 33 at 48) (alleging "Defendants devised, or intended to devise, a scheme to defraud Plaintiffs of money"); id. at 49-50 (alleging all Sherman and RICO Act violations "were done 'in compliance with FIFA and CONCACAF regulations and based on an initiative from FIFA for the expansion of permanent federative national leagues'"). Thus, to establish specific personal jurisdiction over FIFA as to their RICO Act claims, Plaintiffs must show how FPF Defendants´ RICO violations arose from or are related to FIFA's in-forum contacts. Plaintiffs fail to meet this burden.

While Plaintiffs' offer evidence to show FIFA's oversight of FPF's statutes, none of the RICO violations is alleged to have been caused by FPF's compliance with a statute that was reviewed or approved by FIFA. To the contrary, Plaintiffs allege frequently throughout their Complaint that FPF Defendants' RICO violations were contrary to FIFA's rules or directives. See, *e.g.*, id. at 21 ("This action violated the Defendant Federation and FIFA's statutory prohibition of conflict of interest . . . ."); *see also* id. at 32, 33 and 49. Likewise, while Plaintiffs adduce evidence showing FIFA exercised oversight of FPF elections, none of Plaintiffs' allegations suggest FIFA's or FPF's election rules were themselves violations of RICO. For example, Plaintiffs' allegation that Larracuente was blocked from running for FPF

president is based on the "FPF registry department" having "fraudulently misrepresent[ed]" her qualifications. Id. at 36. If anything, such allegations suggest contravention of election rules, not compliance with them.

To the extent Plaintiffs assert FPF Defendants' RICO violations arose from compliance with FIFA's rules or policy, see, e.g. id. at 21-22, that argument fails for lack for lack of factual support. To show specific jurisdiction over FIFA, it is not enough to simply state in a conclusory fashion that any and all of FPF Defendants' illegal conduct was in compliance with, or required by, FIFA's rules. Such an assertion would need to be supported by some allegations of fact. Similarly, Plaintiffs' argument that FIFA was made aware of FPF Defendants' purported RICO violations and allowed them to continue is also insufficient to establish personal jurisdiction, since the mere awareness of something does not always entail in-forum contact. See (Docket No. 105 at 18).

      ii.  *Commonwealth law claims*

Plaintiffs' commonwealth-law allegations against FIFA are based only on group pleadings. See (Docket No. 33 at 56, 57) (referring to "Defendants" broadly without specifying which). The same reasons for why Plaintiffs have failed to show specific personal jurisdiction over the RICO Act claims apply here also.

In short, the Court finds Plaintiffs have failed to show the alleged RICO Acts and Puerto Rico law claims arose from or are related to FIFA's in-forum contacts. Plaintiffs therefore fail to meet their burden of proffering facts to support personal jurisdiction over FIFA as to the RICO Act claims, and FIFA's Motion is therefore **GRANTED** as to personal jurisdiction over FIFA with regards to Plaintiffs' RICO Act claims and commonwealth-law claims.

### III. FIFA's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

#### A. <u>RICO Act and commonwealth-law claims</u>

Even if the Court did have personal jurisdiction over FIFA as to Plaintiffs' RICO Act and commonwealth-law claim, the Court would still dismiss those claims for failure to state a claim. The Court notes Plaintiffs have not alleged any violation by FIFA that they did not also raise against FPF or its directors. As discussed at length in the Opinion and Order at Docket No. 129, Plaintiffs failed to adequately allege a claim under the RICO Act or Puerto Rico law. Plaintiffs' RICO Act claims and commonwealth-law claims against FIFA are **DISMISSED WITH PREJUDICE.**

#### B. <u>Sherman Act Claim</u>

FIFA argues Plaintiffs' section 1 claim should be dismissed because the relevant allegations are conclusory and fail to plead that FIFA actually joined a conspiracy. (Docket No. 88 at 18-20).

FIFA contends what Plaintiffs are really challenging is how FPF used FIFA's policy, not FIFA's policy itself. Id. at 21. However, the Court disagrees. Plaintiffs "challenge[] a specific policy" -- "the rule that all league tournaments must be sanctioned by the National Association in whose territory the match will be played." Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc., 61 F.4th 299, 307, 309 (2d Cir. 2023); (Docket No. 33 at 10). Plaintiffs' allegations that "all Confederations, National Associations, leagues, clubs, referees, game commissioners, venue mangers, and players must comply" with this policy suggests it is both binding and promulgated by FIFA. (Docket No. 33 at 10); Relevent Sports, LLC, 61 F.4th at 307, 309. As such, the Court concludes Plaintiffs have adequately plead concerted action by FIFA.

## IV.  CONCLUSION

For the foregoing reasons, FIFA's *Motion to Dismiss* at Docket No. 88 is **DENIED** as to Plaintiffs' Sherman Act claim; **GRANTED** as to Plaintiffs' RICO Act claims; and **GRANTED** as to Plaintiffs' commonwealth-law claims. Plaintiffs' RICO Act claims and commonwealth-law claims against FIFA are **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of November 2024.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge